**A & H SPORTSWEAR CO., INC. and Mainstream Swimsuits, Inc., Plaintiffs,**

**v.**

**VICTORIA'S SECRET STORES, INC., and Victoria's Secret Catalogue, Inc., Defendants.**

**No. CIV. A. 94–7408.**

United States District Court, E.D. Pennsylvania.

March 12, 2001.

1502, 1510 (11th Cir.1993) (same, although limited to its facts).

Gus Milides, Norman Seidel, Easton, PA, Arthur H. Seidel, Stephen J. Meyers, Philadelphia, PA, for plaintiffs.

Frank J. Colluci, Richard P. Jacobson, New York City; H. Robert Fiebach, David I. Bookspan, Lillian E. Benedict, Philadelphia, PA, for defendants.

### OPINION AND ORDER

VAN ANTWERPEN, District Judge.

Presently before this Court is Plaintiffs' Motion For Hearing on Contempt and Additional Hearing filed January 11, 2001, Plaintiffs' Brief in Support of the Motion, filed on February 8, 2001, Defendants' Memorandum in Opposition to the Motion, filed on January 29, 2001, Plaintiffs' Reply Brief filed on February 9, 2001, and Defendants' Supplemental Memorandum filed on February 28, 2001. For the reasons set forth below, Plaintiffs' Motion is denied in its entirety.

### DISCUSSION

**I. Civil Contempt**

Civil contempt is a sanction to enforce compliance with an order of the court

or to compensate for losses or damages sustained by reason of the noncompliance. *McComb v. Jacksonville Paper, Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *Robin Woods Inc. v. Woods*, 28 F.3d 396, 400 (3d Cir.1994); *McDonald's Corp. v. Victory Inv.*, 727 F.2d 82, 87 (3d Cir.1984); *McGoff v. Rapone*, 78 F.R.D. 8, 28 (E.D.Pa.1978). Neither of these rationales supports a judgment of civil contempt in this case. The later rationale is inappropriate because Plaintiffs have not put forth any evidence of losses or damages resulting from the conduct of which they complain. *See McGoff*, 78 F.R.D. at 28. The first rationale does not apply because Plaintiffs cannot make out a prima facie case.

■■■ To establish that a party is liable for civil contempt a plaintiff must prove three elements: "(1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order." *Roe v. Operation Rescue*, 54 F.3d 133, 137 (3d Cir.1995). These elements must be proved by clear and convincing evidence. *Harris v. City of Philadelphia*, 47 F.3d 1311, 1321 (3d Cir.1995). A court should not hold a party in contempt: "where there is ground to doubt the wrongfulness of the respondent's conduct." *Littlejohn v. Bic Corp.*, 851 F.2d 673, 683–84 (3d Cir.1988); *Quinter v. Volkswagen of America*, 676 F.2d 969, 974 (3d Cir.1982); *Fox v. Capital Co.*, 96 F.2d 684, 686 (3d Cir.1938). Furthermore, the resolution of ambiguities favors the party charged with contempt. *Harris*, 47 F.3d at 1350.

It is axiomatic that we cannot find the Defendants guilty of contempt for failing to use a disclaimer if there is no valid order of this Court requiring them to do so. On July 1, 1997, we issued a Revised Order permanently enjoining the Defendants from using the mark "The Miracle Bra," "Miraclesuit," or any other "miracle" mark in connection with swimwear, including the promotion, advertising, sale and identification of swimwear, unless it used a specific disclaimer.[1] *A & H Sportswear Co. v. Victoria's Secret Stores*, 967 F.Supp. 1457, 1482 (E.D.Pa.1997)("*A & H II*"). The disclaimer had to be published on every page of any catalogue spread or magazine advertisement in which a "miracle" mark appears to identify swimwear on the same page. *Id.* In addition, if the Defendants chose to utilize a toll-free number at any point in their catalogue, the number had to appear within one half inch of each disclaimer.[2] *Id.* at 1483.

This Order was vacated on January 21, 1999, in *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197 (3d Cir.1999)("*A & H III*"), and the case was remanded to us. We then found that the marks MIRACLESUIT® and THE MIRACLE BRA™, were not similar. *A & H Sportswear Co. v. Victoria's Secret Stores*, 57 F.Supp.2d 155, 169 (E.D.Pa.1999)("*A & H IV*"). This finding was based in part on the presumption that the Defendants would continue to adhere to the disclaimer discussed above when marketing their swimwear. *Id.* In reaching this conclusion, we noted that the Defendants were no longer required by an order of court to use the disclaimer because the Third Circuit had vacated the remedy issued in *A & H II. Id.*

1. The disclaimer had to read as follows: "The Miracle Bra™ swimwear collection is exclusive to Victoria's Secret and not associated with MIRACLESUIT® by Swim Shaper.®" *A & H II*, 967 F.Supp. at 1482.

2. The Order also specified the size and color of the disclaimer and required it to be published on a hangtag on each piece of swimwear identified by reference to "THE MIRACLE BRA," or any other "miracle" mark. *A & H II*, 967 F.Supp. at 1483.

This decision was affirmed in part and vacated in part in *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir.2000)("*A & H V*").[3] The Third Circuit stated that it considered Victoria's Secret legally bound to continue the disclaimer practice. *Id.* at 219. Concluding that the Defendants were "legally bound" to follow the particular disclaimer practice is not equivalent to a court ordering that the practice be followed. We cannot use our contempt power to enforce every legal obligation. It is available only to vindicate the authority of this Court by punishing past acts of disobedience or to coerce parties into complying with a court order. *See McDonald's*, 727 F.2d at 86. Failure to follow the disclaimer practice violates an obligation owed to the Plaintiffs, not a duty owed to this Court.

Curiously, both parties contend that, during the time in question, there was a valid order of this Court in effect requiring the use of a disclaimer. However, each points to different orders issued in the history of this case. The Defendants discuss the Order issued by this Court in connection with *A & H II*.[4] *See* 967 F.Supp. at 1482. Violation of this Order could not serve as the basis for a finding of contempt, because, as discussed above, this order was vacated in *A & H III* and was not reinstated on remand. *See A & H III*,

166 F.3d at 210; *A & H IV*, 57 F.Supp.2d at 169. In their reply brief, the Plaintiffs state that their motion charged Victoria's Secret with violating "the District Court's Order of July 29, 1999." Pls.' Reply Br. at I. The brief goes on to cite the text of the *A & H IV* itself and not the order issued in conjunction with that opinion. *Id.* at 1–2. The July 29, 1999 Order does not mandate the use of any disclaimer or discuss any such practice. *A & H IV*, 57 F.Supp.2d at 178–179. In fact, this Order does not grant any affirmative relief and finds in favor of the Defendants. *Id.* Similarly, *A & H V*, which partially vacated the July 29, 1999 Order, does not enjoin the Defendants from using a "miracle" mark.[5] The parties are simply incorrect in their conclusion that a valid order of this Court mandated that the Defendants follow a particular disclaimer practice.

However, the fact that this Court did not order that the Defendants use a disclaimer when marketing THE MIRACLE BRA ™ swimwear does not mean that the Defendants were free to sell their swimwear without a disclaimer. In *A & H IV*, we found that the use of the disclaimer created a distinction between the two marks. 57 F.Supp.2d at 169. If the Defendants had refused to use a disclaimer, our finding, necessarily, would have been different. *Id.* While failure to use a disclaimer may not render the Defendants in contempt of an order of this Court, such

---

**3.** In *A & H IV* we found for the Defendants, concluding that there was no direct or reverse confusion. 57 F.Supp.2d at 179. The Third Circuit affirmed us in regard to the direct confusion claim but vacated our decision with respect to reverse confusion. *A & H V*, 237 F.3d at 237.

**4.** On June 27, 1997, we issued an order which erroneously listed the judgment amount. Accordingly, on July 1, 1997, we issued a revised order which corrected the error. Then, on July 30, 1997, we granted a stay pending appeal and again modified the order. This

modification dealt with the hangtags attached to swimsuits purchased from Victoria's Secret Catalogue, Inc.

**5.** *Compare Reed Publishing v. Execulink*, No. CIV.A. 98–1049 AMW, 2000 WL 1023356 (D.N.J. June 8, 2000). There the court had previously enjoined defendant's use of marks confusingly similar to plaintiffs' various "Who's Who" trademarks. *Id.* at *2. When the defendant began using the mark "Who's Who on CD–Rom" the court found them in contempt. *Id.* at *3.

an action by Defendants would be a violation of their legal obligation. *Id.* Accordingly, we will treat Plaintiffs' Motion as a Motion to Reopen based upon the Defendants alleged failure to abide by their representations that they would use a disclaimer.

### A. Alleged Failure to Use the Disclaimer in a Catalogue

Plaintiffs attempt to use the following quote from *A & H V* to support their contention that the Defendants failed to adhere to the disclaimer practice:

> We consider Victoria's Secret legally bound to continue the disclaimer practice .... It would be well advised to continue to place the disclaimer near to the telephone number in the catalogue. We judicially notice the fact that in one recent catalogue the disclaimer was not so near the telephone number, a lapse that is potentially problematic.

Pls.' Mot. at 1–2 *quoting* 237 F.3d at 219 n. 11. The Third Circuit did not provide any descriptive information about this lapse. *See id.* Nor have the Plaintiffs included a

copy of the catalogue or provided any other information about this alleged infraction. We have not attempted our own examination of whether the disclaimer was properly used in the hundreds of catalogues that the Defendants have published in "recent" history.[6] Absent some additional information from the Plaintiffs we decline to reopen this case on the basis of this statement in *A & H V. See* Pozy Decl. at ¶ 6 ("To the best of my knowledge, VS Catalogue has faithfully and properly utilized the disclaimer in the Victoria's Secret catalogue since this Court mandated its use").

### B. The Use of the Disclaimer on Defendants' Web Site

█ Plaintiffs also contend that since December 1, 2000, the Defendants marketed THE MIRACLE BRA ™ swimwear on the internet without any disclaimer.[7] Pls.' Mot. at 2. Defendants argue that they have, since the inception of their web site [8], used the disclaimer on each and every page [9] at which a consumer may commence a purchase of THE MIRACLE BRA ™

---

6. Early on this litigation, Victoria Secret voluntarily followed a disclaimer practice. During this time the disclaimer was inadvertently omitted from a single page which contained. THE MIRACLE BRA ™ swimwear in a clearance catalogue that was mailed on June 17, 1997. *See* Pozy Decl. at ¶ 6. This oversight was immediately rectified and we declined to impose contempt sanctions when the error was brought to our attention. *Id.*, July 30, 1997 Order. This incident may have been the basis for the comment in *A & H V.*

7. Plaintiffs do not complain of any internet activity occurring prior to December 1, 2000. Accordingly, we need not examine whether the Defendants internet activity violated our 1997 Order which was in effect until January 21, 1999. Defendants launched their web site on December 4, 1998. Pozy Decl. at ¶ 7. They introduced THE MIRACLE BRA ™ swimwear on January 17, 1999. Pozy Supp. Decl. at ¶ 3. Even if we were to examine the five day period between the introduction of the swim-

wear on the web site and the vacation of our Order, it is unlikely that we would find any violations. The use of the disclaimer on the web site, as described by James Pozy in his declaration, is consistent with our 1997 Order and the representations made to this Court in connection with *A & H IV.*

8. A "web site" is a group of related web pages. *Encarta® World English Dictionary* (North American Ed.1999–2000). *See also American Civil Liberties Union v. Reno*, 929 F.Supp. 824, 830–838 (E.D.Pa.1996)(discussing the nature of the internet).

9. A "web page" is a location on the world wide web. *Encarta® World English Dictionary* (North American Ed.1999–2000). It is a computer file, encoded in hypertext markup language (HTML) and it contains text, graphics and sound files which is accessible via the internet. *Id.* Every web page has a unique Uniform Resource Locator (URL), or address. *Id.*

swimwear. Pozy Decl. ¶¶ 9, 13–16; Fish Decl. ¶¶ 7–8.[10] We have considered the evidence and arguments put forth by both parties and we accept the explanation provided by James J. Pozy, the Director of Inventory Control for Victoria's Secret Catalogue, Inc.[11]

Our decision in *A & H IV* does not specifically address internet marketing of THE MIRACLE BRA™ swimwear. However, it does state that in concluding that the two marks were not similar we relied on the Defendants representations that it would continue to use a disclaimer when marketing the swimwear. 57 F.Supp.2d at 169. The Defendants agreed to do more than just utilize the disclaimer in their catalogues. *Id.* at 176. Failing to use a disclaimer on the web site could potentially jeopardize our finding that there is no similarity between the two marks. *Id.*

The Defendants argue that they only had to use the disclaimer in print media and that they only used the disclaimer on the website as an expression of "good faith." Defs.' Suppl. Mem. at 3, 5. We decline to grant Defendants request to draw meaningless distinctions between marketing swimwear via a print catalogue and marketing it via a website. The Victoria's Secret web site is directly analogous to the Victoria's Secret hard copy catalogue. The term catalogue encompasses both paper booklets and compilations of information on web sites. The *American*

*Heritage® Dictionary* (3d ed.1996) defines a catalogue as: "a list or itemized display, ..., usually including descriptive information or illustrations." The secondary definition states that a catalogue is a "publication ... containing such information." *Id.* The term is not limited to paper versions of catalogues. *Id.* In fact, the Defendants themselves refer to the content on their web site as a catalogue. *See* Def. Ex. A (printout of the Defendants internet home page which invites viewers to "browse and shop" from current "catalogues"); Pozy Decl. at ¶ 8 ("we looked at the Court's order and analogized Victoria's Secret's website to the Victoria's Secret catalogue"). No reasonable person would presume that the Defendants representation that it would utilize a disclaimer when marketing the swimwear included the implicit restriction that the disclaimer did not have to be used when the catalogue was delivered electronically to consumers rather than through the mail. *See Playboy Enter., Inc. v. Chuckleberry Publ'g, Inc.*, 939 F.Supp. 1032 (S.D.N.Y.1996).[12] We find that the Defendants' web site is equivalent to its paper catalogues and that, in order for the marks to continue to be dissimilar, a disclaimer must be used on the web site.

This does not end our discussion because the Defendants have in fact utilized a disclaimer since they began marketing THE MIRACLE BRA™ swimwear on the internet. Pozy Supp. Decl. at ¶¶ 3, 6.

**10.** Defendants also argued that our 1997 Order did not address the use of the disclaimer on the web site. As discussed above, this order was vacated and is inapplicable to the instant motion. Therefore, whether it did, or did not, cover the web site is irrelevant here.

**11.** Victoria's Secret Catalogue, Inc. has been known as Victoria's Secret Direct, LLC since January 1, 2001.

**12.** In *Chuckleberry*, the district court had permanently enjoined the defendant from using

the word "Playmen" or any word confusingly similar when publishing, distributing, or selling its magazine in the United States. *Id.* at 1037. In January 1996, Playboy Enterprises discovered that the Defendant had created a web site featuring the name and brought a motion to hold them in contempt. *Id.* at 1042–1043. The court found that the injunction applied to the web site even though the internet, in its modern form, wasn't even in existence at the time of the injunction. *Id.* at 1037.

Plaintiffs contend that the Defendants failed to use the disclaimer wherever the swimwear appeared. They do not complain about the size, color, or location of the disclaimer when it was used. Nor do we think that there are grounds for such complaints in light of Defendants Exhibits E, F, G, and I. The Defendants maintain that they have followed a disclaimer practice on their web site in a manner consistent with the orders of this Court.

During this litigation, the Defendants represented that they would publish the disclaimer [13] on every page of any catalogue spread or magazine advertisement in which a "miracle" mark appears to identify swimwear on the same page. *A & H II*, 967 F.Supp. at 1482–1483; *A & H IV*, 57 F.Supp.2d at 176, *A & H V*, 237 F.3d at 219. We find that they have properly adapted this practice to their web site.[14]

The disclaimer takes on a proper level of prominence on the web site. It appears at every step of the purchase and order process involving THE MIRACLE BRA™ swimwear. Pozy Decl. ¶¶ 13–17. If a user directly accesses the area of the site for THE MIRACLE BRA™ swimwear, by selecting the "Shop by Collection" choice on the menu bar,[15] the disclaimer appears on each and every web page for the items in the collection. *Id.* at ¶ 13, Def. Ex. E. Users can also access the swimwear in a variety of other ways. *Id.* at ¶¶ 10–17. The picture of every swimsuit in THE MIRACLE BRA™ line is linked[16] to the individual web page for that item. *Id.* at ¶ 14. Clicking[17] on the swimsuit takes the

13. Defendants represented that they would follow this disclaimer practice: (a) They will publish the disclaimer, "The Miracle Bra™ swimwear collection is exclusive to Victoria's Secret and not associated with MIRACLE-SUIT® by Swim Shaper®" in connection with any promotion, advertising, sale or identification of such swimwear; (b) This disclaimer will be published on every page of any catalogue spread or magazine advertisement in which a MIRACLE mark appears to identify swimwear on the same page. The disclaimer will appear in a reasonable type. If a toll free number is used at any point in their catalogue, the number is to appear within one half inch of each disclaimer. The disclaimer will appear in a color which clearly distinguishes it from the background on which it is printed. *See* 967 F.Supp. at 1482–1483, 57 F.Supp.2d at 175–176.

14. In *A & H IV* and *A & H V* the Defendants represented that they would utilize a disclaimer practice identical to one they were ordered to comply with in *A & H II*. Therefore, if our 1997 Order was still effect, we could not have found the Defendants in contempt. Their use of the disclaimer has been consistent with the representations they made before this Court and likewise is consistent with the practice we ordered in *A & H II*. Plaintiffs have not shown that the Defendants disobeyed any order of this Court.

15. A "menu bar" is a permanently displayed menu spread horizontally across the top of the screen or window. *See The Free On-line Dictionary of Computing*, http://www.foldoc.org, (Denis Howe ed.2000). When the mouse is pressed over an item on the menu bar, a pull-down menu appears. *Id.* It is from this pull down menu, a site visitor can select "The Miracle Bar™" line.

16. On the internet, a link refers to cross-reference between two documents. *American Heritage Dictionary* (3d Ed.1996)(defining hyperlink). When a user activates the link, it causes the application reading the document to load a different section of the document, a new document or a resource that the application can display or use. *Id.* On the Defendants' web site, clicking on a picture of THE MIRACLE BRA™ swimsuit directs the browser software to a new web page. Pozy Decl. ¶¶ 14–16. From this web page, a user may commence a purchase of the swimsuit. *Id.* at ¶¶ 14–15.

17. In computer science "clicking" refers to pressing down and releasing a button on a pointing device, such as a mouse, in order to select an item on a display screen or activate a command or function. *American Heritage Dictionary* (3d Ed.1996).

user to the product's individual web page where the disclaimer appears. *Id.* It is from these individual pages that a user may enter his or her preferences for color, size, and quantity. *Id.;* Def. Ex. F. After a consumer makes these selections, they can add the item to their virtual shopping cart. *Id.* at ¶¶ 14–15. Doing so generates a new web page which depicts the same image of the swimsuit, the description of the suit, details of the order, and the disclaimer. *Id.* at ¶ 15; Def. Ex. G.

The Defendants admit that it is possible to view the swimwear without seeing the disclaimer. *Id.* at ¶¶ 18–19. If a user accesses the site's search function, it returns a variety of thumbnail sized images of Victoria's Secret products. Pls.' Ex. A. Underneath each picture is the name of the article of clothing visible. *Id.* For instance, if a user did a search for a "one-piece swimsuit," the search engine would bring up pictures of all swimwear matching that criteria. Pls.' Ex. A; Pozy Decl. at ¶¶ 18–22. It is at this point that a user could see a picture of a swimsuit with the name "The MIRACLE BRA ™ Swimwear" underneath it without any disclaimer. *Id.* The disclaimer appears when the user clicks on the thumbnail picture, or the name underneath. Pozy Decl. ¶ 19; Def. Ex. F. Clicking on the picture or name takes the user to a new web page where the disclaimer prominently appears adjacent to a larger image of the swimwear and underneath the product's description. *Id.* Essentially, the search function provides a data gathering mechanism which narrows down a viewer's choices. *Id.* at ¶¶ 18–19. If a visitor to the site utilizes the search engine, it does not mean that they will never view the disclaimer. *Id.* On the contrary, the consumer is exposed to the disclaimer well before a purchase decision is made. *Id.* at ¶ 20; Pozy Supp. Decl. at ¶ 5.

The Defendants never represented, nor has this Court required, that the disclaimer be used whenever and wherever there is a picture of swimwear from THE MIRACLE BRA ™ line. This Court ruled the disclaimer did not have to be presented on the cover of a printed catalogue so long as it appeared with the product copy within the book. Sept. 16, 1997 Order.[18] The pictures produced by the search engine are analogous to the photograph on the cover of a catalogue. *See Chuckleberry,* 939 F.Supp. at 1040 n. 6 (analogizing a defendant's internet homepage to the cover of its magazines). A consumer must undertake additional steps before they can commence the purchase of the product, and during this time they are exposed to the disclaimer.

In their Reply Brief, the Plaintiffs accuse the Defendants of inserting the disclaimer after the Motion for Contempt was filed. Pls.' Reply Br. at 14–18. As support for this contention, they ask us to compare their exhibits with those of the defense. *Id.* at 15. We have done so and find their contention meritless. The exhibits show different pages of the web site.[19] Pozy Supp. Decl. at ¶ 4. The Defendants candidly and forthrightly admitted

---

**18.** This Order clarified July 30, 1997 Order Granting Stay Pending Appeal and Modifying Revised Order. The September 16, 1997 Order provided as follows: "Nothing contained in the Court's 'Order Granting Stay Pending Appeal and Modifying Revised Order' shall preclude Victoria's Secret Catalogue, Inc. from presenting THE MIRACLE BRA swimwear mark, or product, or both, on the cover of the Victoria's Secret catalogue without the disclaimer mandated by this Court's Order, provided the disclaimer is utilized on the per-

tinent page or pages within the catalogue itself."

**19.** Attached to their motion as Exhibit A, Plaintiffs included a print-out of the web page where a user commences a swimwear search and web pages produced by various searches. The parties agree that on these pages, a user will not see a disclaimer. Defense Exhibit E is the web page which appears when a visitor chooses the "Shop by Collection" feature of the web site and here the disclaimer is plainly

that when a visitor utilizes the search function they will not see the disclaimer until they click to enlarge the image. Pozy Decl. at ¶ 18–22. If a particular search happens to return only THE MIRACLE BRA ™ swimwear, the disclaimer will not appear. Pls.' Ex. A. However, if a user clicks to see THE MIRACLE BRA ™ swimwear collection, a group photo will appear with the disclaimer featured on top of the page. Def. Ex. E. Likewise, if a user clicks on an individual photograph generated by the search engine, they are taken to a new web page where the disclaimer appears. Def. Ex. F and I. The insinuation that Mr. Pozy lied in his declaration is baseless.

The Defendants use of the disclaimer on the web site is consistent with the representations they have made to this Court. Since the Plaintiffs have not shown a failure to comply with the disclaimer practice as represented, we find no reason to re-open this case.

## II. Motion for an Additional Hearing

The Plaintiffs also move for an additional hearing to open up the record and introduce more evidence. Pls.' Mot. at 3. We decline to grant this request. There have been two separate trials and extensive factual findings contained in the combined six substantive opinions between this Court and the Court of Appeals. Though the Third Circuit stated that we, "may wish to hear and consider additional evidence from the parties on reverse confusion," we are not required to do so. *See A & H V*, 237 F.3d at 238. *See also A & H III*, 166 F.3d at 209–210 ("The court has shown full comprehension of the facts, and it may be that

the court can make the relevant findings from material already available"). At this point in time, we have before us all the facts required for us to make a determination consistent with the Third Circuit's remand.

The following section provides only a brief over-view of the fact-finding and analysis that this Court has already undertaken.

## A. Fact-finding Previously Engaged In

In *A & H I*, we granted Defendants' motion for separate trials on the issues of liability and damages. Oct. 25, 1995 Order. We then began a two-week non-jury trial to determine issues of liability. On May 24, 1996, we issued a decision, concluding that: (1) Plaintiffs failed to show a likelihood of confusion with respect to Defendants' use of its mark on lingerie, but (2) Plaintiffs established a possibility of confusion necessary for relief with respect to Defendants' use of the mark on swimwear. *A & H I*, 926 F.Supp. 1233, 1269 (E.D.Pa.1996). Pursuant to Fed.R.Civ.P. 52(a), we also made extensive findings of fact based on numerous trial exhibits, trial depositions, and witness testimony. *Id.* at 1234–1254.

Before deciding whether Plaintiffs had shown a possibility of confusion, we examined whether there was a likelihood of confusion. We applied the standard set forth in *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (3d Cir.1978), which is functionally equivalent to the test set forth in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir.1983)("Lapp test").[20] Under this standard, we exam-

---

visible. Defense Exhibits F and I are copies of the web pages which appear when an individual wishes to learn more about a particular swimsuit or to place an order. On all of these individual pages, the disclaimer appears.

**20.** *Lapp* established a ten-factor test to determine the likelihood of confusion for direct confusion claims between goods that do not directly compete in the same market. 721 F.2d at 463.

ined: (1) the similarity of the marks, (2) the strength of the term "miracle," (3) the price of goods in issue, (4) the length of time the Defendants used the mark without confusion, (5) the Defendants' intent, (6) evidence of actual confusion, (7) the similarity of marketing and media channels, (8) the extent to which the target sales groups are the same, and (9) the public perception of the relationship of the goods. *A & H I*, 926 F.Supp. at 1257–1263. We also examined other factors which might suggest that the public expected Plaintiffs to manufacture a product in Defendants' market. *Id.* at 1263. After evaluating these factors, we stated: "We therefore conclude that Plaintiffs have not met their burden under the Scott Paper standard and have not established a likelihood of confusion between their MIRACLESUIT swimsuit and Defendants' THE MIRACLE BRA (bra)." *Id.* at 1264.[21]

Our conclusion that the standard for likelihood of confusion had not been met did not answer all issues raised by the litigation. *Id.* at 1265. The Scott Paper/Lapp test was developed for directly competing goods. 721 F.2d at 463. Because THE MIRACLE BRA ™ swimsuit was in the same market as the MIRACLESUIT® swimsuit, we applied the easier to satisfy possibility of confusion standard. *See Country Floors, Inc. v. A Partnership Composed of Gepner and*

*Ford,* 930 F.2d 1056 (3d Cir.1991); *Merchant & Evans v. Roosevelt Bldg. Prod.*, 963 F.2d 628, 637 (3d Cir.1992).[22] Under this test, we looked at the relevant market, how new Defendants were to that market, Defendants' intent in adopting the mark, and consumers reliance on the mark. *Id.* at 1266–1268. After review of these factors, we concluded that Plaintiffs had shown a possibility of confusion.

We then proceeded to a damages trial to determine the appropriate relief. *Id.* at 1269. We found that Plaintiffs were entitled to: (1) monetary relief in the form of a reasonable royalty on Defendants' sales; and (2) an injunction preventing the Defendants from using THE MIRACLE BRA trademark unless it used a disclaimer and paid the swimwear manufacturer a periodic reasonable royalty. *A & H II*, 967 F.Supp. at 1482–1483. In deciding the appropriate relief, we again made numerous findings of fact relevant to the damages issue. *Id.* at 1462–1467.

Both parties appealed our judgment. *A & H III*, 166 F.3d at 199. After *en banc* review, the Third Circuit held that the possibility of confusion standard no longer existed in this circuit. It determined that the likelihood of confusion was the applicable standard for directly competing goods. *Id.* at 205. After adopting this new test, the court held that it was clearly erroneous

**21.** Similarly, the Order issued in conjunction with this case also contained our conclusion: "We find in favor of the Defendants with regard to all other claims for liability including Likelihood of Confusion and the Pennsylvania Antidilution statute, 54 Pa.C.S.A. § 1124." *Id.* at 1270. We did not explicitly state that there was no likelihood of confusion between THE MIRACLE BRA ™ *swimsuit* and the MIRACLESUIT® *swimsuit.*

**22.** Several other cases also supported applying possibility of confusion standard where a party moves into the territory of an established concern: *Telechron Inc. v. Telicon*

*Corp.*, 198 F.2d 903, 908–909 (3d Cir.1952); *Dominion Bankshares Corp. v. Devon Holding Co. Inc.*, 690 F.Supp. 338, 345 (E.D.Pa.1988); *Blumenfeld Dev. v. Carnival Cruise Lines*, 669 F.Supp. 1297, 1300 (D.N.J.1987). *See also Versa Prod. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 200 (3d Cir.1995)(noting that the likelihood standard has been relaxed to a possibility standard in some cases). Prior to *A & H III*, district courts in the Third Circuit typically found both a likelihood and a possibility of confusion or no liability at all. *See A & H II*, 967 F.Supp. at 1467 (collecting cases).

for us to have held the Defendants liable under the possibility of confusion standard. *Id.* at 206. The case was remanded to us for the purpose of examining the likelihood of confusion between the two marks when used on directly competing goods. *Id.* at 207. Specifically, the court instructed that we must: "conduct the appropriate analysis ... under the standards set by the Lanham Act and in the relevant precedent." *Id.* at 206.

To make the requisite determination we drew upon the then existing case law and looked at seven broad factors. *A & H IV*, 57 F.Supp.2d at 163–164 (collecting cases). First, we examined the strength of the "miracle" mark. *Id.* at 164–166. Then we analyzed the similarity of the marks. *Id.* at 166–170. In looking at this factor we evaluated the sight, sound, and meaning of the marks. *Id.* at 166–168. We also took into consideration the use of the Victoria's Secret housemark and the disclaimer practice. *Id.* at 168–170. We then turned to the similarity of the products themselves and marketing channels used. *Id.* at 170–171. To determine the similarity of the products we looked at the relationship of the goods in the minds of consumers and the targets of the parties' sales efforts. *Id.* We then assessed the sophistication of the purchasers and the degree of care they were likely to use. *Id.* at 171–172. We inquired into what the Defendants intent was in adopting the mark. *Id.* at 172–174. Finally, we evaluated Plaintiffs evidence of actual confusion. *Id.* at 174–175. None of these factors received determinative

weight. *Id.* at 163–164. After weighing all of these factors we concluded that there was no possibility of direct confusion. *Id.* at 164–176.

Plaintiffs again appealed arguing, among other things, that we misapplied the test for direct confusion. *A & H V*, 237 F.3d at 206–208. This time, the Third Circuit clarified the likelihood of confusion test for directly competing goods. *Id.* at 212–215. It decided that all ten Lapp factors should be considered. *Id.* The court then ruled that although we styled our evaluation as a seven-factor test, it incorporated all of the elements of the Lapp test.[23] *Id.* Therefore, the court affirmed our decision with respect to Plaintiffs' direct confusion claim. *Id.*

The court went on to review Plaintiffs' reverse confusion claim. After considering the evidence, we had concluded that the doctrine of reverse confusion was not implicated. *A & H IV*, 57 F.Supp.2d at 178. The appellate court disagreed, ruling that we improperly evaluated the claim. *A & H V*, 237 F.3d at 227. The court went on to elucidate a new test for reverse confusion claims. *Id.* Under this new test, courts must analyze all ten Lapp factors. *Id.* at 227–229. Thus, the test for direct confusion and reverse confusion is now the same. *Id.*

For several of the Lapp factors, the analysis is identical for direct and reverse confusion claims. *Id.* at 229. For instance, examining the attentiveness of the consumers does not change when it is con-

**23.** Several of the Lapp factors overlap to some degree. In *A & H IV* we examined the overall similarity of Plaintiffs and Defendants products. The Third Circuit recognized that this discussion incorporated an analysis of the relationship of the goods in the minds of consumers and the extent to which the parties targeted the same group of people. *A & H V*, 237 F.3d at 215. Similarly, Lapp factors four and six both direct courts to look at instances

of "actual confusion." *Id.* Rather than separately examine the length of time the defendant has used the mark without evidence of actual confusion and evidence of actual confusion, we generally evaluated whether the two marks had resulted in "actual confusion." *A & H IV*, 57 F.Supp.2d at 174–175. Moreover, as discussed above, in *A & H I* we did examine each of the Lapp factors individually. *See* 926 F.Supp. at 1257–1263.

sidered in the reverse confusion context. *Id.* Similarly, the degree to which the channels of trade and advertisement overlap requires the same evidence and analysis. *Id.* Finally, the similarity of the targets of the parties sales efforts and the similarity of products are evaluated no differently in the reverse confusion context. *Id.* We have already engaged in extensive fact finding on these issues. *See A & H I* and *A & H IV.* Moreover, as the court noted in *A & H V,* our consideration of these factors is unlikely to differ from that which we found when we looked at the identical factors in conjunction with the direct confusion claim. 237 F.3d at 237. Accordingly, we do not require any additional information to evaluate these factors in a manner consistent with the remand instructions. *See id.* at 236–238.

Not all of the Lapp factors are analyzed the same for reverse confusion claims. *Id.* at 229–234. The analysis may differ with respect to the following factors: the similarity of the marks, the strength of the marks, the intent of the defendant in adopting the mark, and factors relating to actual confusion. *Id.* In addition, what amounts to another "relevant factor" will be different with reverse confusion claims. *Id.* at 234. However, as discussed below, we already have sufficient evidence to evaluate these factors.

### 1. Similarity of The Marks

The core analysis we must engage in to determine the similarity of the marks in the reverse confusion context is the same as that undertaken with direct confusion. *Id.* at 229–230. What differs is the weight given to the use of a disclaimer and the presence of a housemark. *Id.* This is a difference in degree and does not require any additional evidence. The Plaintiffs argue that they should be given an opportunity to present evidence of instances where the disclaimer has not been used. Pls.' Reply Br. at 12; Pls.' Mot. at 4. They were given an opportunity to do so in connection with this motion. As discussed above, we considered Plaintiffs' evidence and concluded that the Defendants have utilized an effective disclaimer practice on their website. Moreover, such evidence, even if it existed, is unlikely to be helpful because the weight given to the presence of a disclaimer is lessened in the reverse confusion context.

### 2. Strength of the Marks

In the reverse confusion context, an analysis of the strength of the marks requires consideration of both commercial and conceptual strength. *A & H V,* 237 F.3d at 230. The "commercial strength" of a mark is evaluated in terms of: (1) the commercial strength of the junior user vis a vie the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark. *Id.* at 231. In *A & H IV,* we specifically evaluated the commercial strengths of the MIRACLESUIT® and THE MIRACLE BRA™ in the reverse confusion context. 57 F.Supp.2d at 176–178; *A & H V,* 237 F.3d at 234–235 (discussing our analysis). We did not specifically discuss the amount of free advertising the Defendants received in conjunction with the launch of their product, but we can do this on the record before us.[24] Plaintiffs argue that it should be given an opportunity to discover and present evidence on the Defendants size and commercial power. Pls.' Mot. at 4. In *A & H I, II* and *IV,* we examined extensive evidence

---

**24.** If for some reason the record is incomplete on this point, we will advise the parties and take the appropriate action.

on this issue. We have not been instructed to revisit this issue as of today. This case has been remanded for the purpose of us examining the evidence in a new manner. *A & H V*, 237 F.3d at 236. No new trial was ordered. *Id.* We have substantial evidence which we can use to determine the commercial strength of the parties marks.

The Third Circuit also held that we should have also looked at the distinctiveness or conceptual strength of the marks. *A & H V*, 237 F.3d at 231. We have sufficient evidence to make this evaluation. In *A & H IV*, we touched upon the distinctiveness of mark by considering whether consumers, upon seeing the MIRACLE-SUIT® would think it was one of Defendants' products.[25] 57 F.Supp.2d at 178 n. 32. We noted that most of the incidents of confusion alleged by the Plaintiffs were incidents of direct, not reverse confusion. *Id.* The parties are not specific and do not discuss any new evidence which they would like to present or acquire to aid us in determining the distinctiveness of the marks.[26] We find that we have enough evidence to engage in a more detailed analysis of the distinctiveness of the "miracle" mark in the reverse confusion context.

## 3. The Intent of the Defendant

In *A & H V*, the court noted that "intent to confuse" is unlikely to be present when reverse confusion is alleged. 237 F.3d at

232. Nonetheless, the court directed that courts consider whether a party deliberately intended to confuse the public when they adopted the mark. *A & H V*, 237 F.3d at 233. We have previously decided that the Defendants did not intend to confuse when they adopted the mark. *A & H I*, 926 F.Supp. at 1260–1261; *A & H IV*, 57 F.Supp.2d at 172–174. This determination looks at what occurs at the time of adoption and the fact that considerable time has passed since we found this fact does undermine the validity of our decision.

## 4. Other Relevant Factors

The final factor of the reverse confusion test directs courts to look at "other relevant facts." *A & H V*, 237 F.3d at 234. Courts should evaluate facts suggesting that the consuming public might expect the larger, more powerful company .to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market. *Id.* In *A & H IV* we applied a general test to see if the doctrine of reverse confusion was implicated. 57 F.Supp.2d at 176. Although the Third Circuit has now decided that we should employ a ten-factor test, the analysis we previously engaged in adequately addresses the concerns behind this catch-all factor. Neither party suggests that there are other relevant factors for which we need

**25.** This is precisely the type of analysis the Third Circuit directed that we employ on the most recent remand of this case. *A & H V*, 237 F.3d at 237. In *A & H V*, the court gave an example of a consumer viewing a doll with the mark "Exxon." *Id.* at 231. Because the Exxon mark is so readily identifiable, a consumer viewing the doll could think that Exxon entered the doll making business. *Id.* On the other hand, if a consumer saw a doll bearing a familiar, but weak laudatory mark such as "Merit," it is unlikely that he or she would assume that the doll is connected with the similarly named gasoline or cigarettes. *Id.* In

*A & H IV*, we did evaluate whether there were instances of consumers concluding that Defendants made the MIRACLESUIT®. 57 F.Supp.2d at 178 n. 32.

**26.** Plaintiffs state for us to evaluate the strength of the marks, we should have before us "such evidence as the Plaintiffs may provide." Pls.' Reply Br. at 13. Plaintiffs have had ample opportunities to present information on the relative strengths of the two marks. They do not even argue if given the opportunity they will in fact provide information useful in examining this factor.

more information or which were overlooked in our prior decisions.

## B. Conclusion

There is no need for us to gather additional evidence through a hearing or by allowing additional discovery. For certain factors, the analysis is the same for direct and reverse confusion claims. For the remaining factors which require a different analysis we have substantial evidence before us from which we can make the requisite evaluations.

Plaintiffs argue that many of our findings of fact occurred years ago. While we recognize that this litigation has covered a substantial period of time, we note that we have not been instructed to revisit the issues as of the current time period. Indeed the Circuit Court explicitly recognized our ability to decide the remanded issue on the substantial record already before us. *A & H V*, 237 F.3d at 238.

Plaintiffs also argued that they should be allowed to discover and present evidence on the issue of damages. Pls.' Mot. at 5. If we conclude that Plaintiffs have met their burden on the reverse confusion claim, we will then proceed to determine the appropriate relief. At this point, there is no need for us to order discovery or hold a hearing on a potentially irrelevant issue.

We will allow the parties further opportunity to submit proposed findings of fact and brief the reverse confusion claim which has been remanded to us. Plaintiffs shall have thirty days to file such papers with us and Defendants will have thirty days to respond and submit proposed findings of fact. Thereafter, Plaintiffs shall have twenty-one days from the filing and service of these papers to file a reply brief and detailed reply to Defendant's proposed findings of fact.

An appropriate order follows,

## *ORDER*

AND NOW, this 12th day of March 2001, upon consideration of Plaintiffs' Motion For Hearing on Contempt and Brief in support thereof filed on January 11, 2001 and February 8, 2001 respectively, Defendants' Memorandum in Opposition thereto filed on January 29, 2001, Plaintiffs' Reply filed on February 9, 2001, and Defendants' Supplemental Memorandum filed on February 28, 2001, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' Motion for Hearing on Contempt and Additional Hearing in Conformity with Remand is DENIED in its entirety.

2. Plaintiffs shall have thirty days from today to file an additional memorandum on its reverse confusion claim and not more than twenty-five sequentially numbered proposed additional findings of fact.

3. Defendants shall have thirty days from the filing and service of these papers to file a response brief, a detailed response to each of Plaintiffs' proposed findings of fact, and not more than twenty-five sequentially numbered proposed additional findings of fact.

4. Plaintiffs shall have twenty-one days from the filing and service of these papers to file a reply brief and detailed reply to each of Defendant's proposed additional findings of fact.

5. All briefs, proposed findings of fact, responses, and replies shall be reasonable in length and fully annotated to the opinions in this case, to this Court's prior findings of fact and to the established record if necessary. The response and reply to the proposed findings of fact shall set forth all areas of agreement and disagreement. The Court may treat any issue or fact not raised as waived. We would prefer that, to the extent possible, the parties rely

on existing findings of fact already made in this case and references to them in the briefs shall not count against the numerical limitation of twenty-five imposed against the proposed additional findings of fact herein.